UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Docket No.   20-CR-10084-RGS |
| | ) | |
| | ) | |
| CHRISTOPHER SANTOS | ) | |

**DEFENDANT'S EMERGENCY MOTION TO RECONSIDER PRETRIAL RELEASE ON CONDITIONS BASED ON CHANGED CIRCUMSTANCES AND COVID-19 PANDEMIC**

The defendant, Christopher Santos, respectfully moves this court, on an emergency basis, to reconsider its prior order regarding pre-trial detention and to release him on conditions pending trial in this matter. Mr. Santos was previously ordered detained following a detention hearing on February 18, 2020 pursuant to 18 U.S.C. § 3142. ECF No. 12. He is detained at the Wyatt Detention Facility, where at least one inmate has tested positive for COVID-19, and the facility's efforts to curb the spread of infection fall markedly below what the CDC has recommended for the general public. The conditions at the facility give rise to a serious risk that Mr. Santos will contract this virus and warrant reconsideration of the Court's prior detention order. Mr. Santos was previously released while this matter, previously as charged in the Plymouth Superior Court, was pending for a matter of almost two years. Similar conditions can be crafted now to ensure the safety of the community while also saving Mr. Santos, and others in the jail, from this deadly virus. The government objects.

## I. FACTUAL BACKGROUND

### A. Procedural History

On October 18, 2018 the defendant was stopped in a motor-vehicle in the city of

Brockton. The motor-vehicle was suspected of being in a car accident. When Mr. Santos was pat

frisked a firearm was found on his person. Mr. Santos was indicted in the Plymouth Superior

Court with eight (8) separate indictments related to the possession of the firearm. Two of the

indictments - M.G.L.c 269 §10(d) and §10G(a) - carry mandatory minimum sentences of 5 and 3

years respectively. At his Superior Court arraignment on December 6, 2018 Mr. Santos was

released on $10,000 bail and a GPS monitoring device.

On January 31, 2020, after a pre-trial hearing at the Plymouth Superior Court, Mr. Santos

was questioned by agents of the ATF and Detectives of the Brockton Police Department. After

this interaction the same agents appeared at Mr. Santos' home and questioned him there. He

agreed to a consent search of his motor-vehicle and his home. At that time he was arrested and

detained. The agents were questioning Mr. Santos about a second allegation, where it is alleged

that on January 28, 2020 – Mr. Santos was meeting with 2 other individuals who were planning

to rob an undercover federal agent posing as an arms dealer. In this second allegation Mr. Santos

was said to be the provider of firearms. The two other individuals are currently under indictment

in this Court. Mr. Santos was never located with any firearms, and the agents did not locate

firearms at his home or in his car. On February 18, 2020 this court held a hearing to determine

whether Mr. Santos should be detained pending trial pursuant to 18 U.S.C. § 3142. During the

hearing, an agent from the ATF testified regarding the investigation into Mr. Santos and his

alleged involvement in the January 28th allegation. During the testimony the agent made

reference to a text message conversation with a phone connected to Mr. Santos. The text

messages were recovered from one of the other two individuals who were detained that day. That

text message conversation was produced as an exhibit in the report offered by the government

and received by the court. ECF No 11. There are no conversations about guns in the text messages, and nothing in the report demonstrates that the government has any other conversations, although it would seem to reason that other conversations exist. The government also referenced video surveillance in which Mr. Santos allegedly can be seen going into a home in Quincy with one of the two persons currently under indictment for this alleged scheme. That video has not been produced. In addition, during the hearing the agent testified that the defendant made statements when he was detained and his car and home were searched. Those statements were related to a phone that was located in his vehicle. The report does not mention these alleged statements. Lastly, the government produced evidence that Mr. Santos' GPS location points had placed Mr. Santos nearby to the meeting place where the two individuals were meeting with the UC agent.

The evidence concerning the January 28, 2020 incidence was relied upon heavily by the government in their request that Mr. Santos be detained. However, Mr. Santos has yet to be charged with anything having to do with this incident. The government's delay in seeking an indictment against Mr. Santos for this incident is entirely due to the COVID-19 outbreak. But for that delay in the proceeding the defendant would at this point be entitled to discovery under Federal Rule of Criminal Procedure 16(a) and Local Rule 116.1(c).

The defendant submits that in light of the delay attributed to the COVID-19 pandemic, and the risk of infection Mr. Santos faces in detention, the Court should reconsider its prior order detaining Mr. Santos and now release him on conditions.

### B.  Personal History

Christopher Santos was born in Brockton, MA. Mr. Santos is 28 years old. He was

educated in Brockton school system. Mr. Santos has two brothers who both live in Brockton. Mr. Santos lived with his mother and father at 26 Snow Ave., Brockton, MA prior to his detention. Mr. Santos has lived there most of his adult life.

Mr. Santos does have a criminal history. In 2008, Mr. Santos was charged as a juvenile with possession of a firearm. Mr. Santos was released on bail on that case. The case ended with a finding of delinquency. In February 2010, Mr. Santos was charged with Possession with Intent to Distribute Class A substance as well as Possession of a firearm. (1083CR0017). He received a sentence of 2 ½ to 2 ½ years and one day with 3 years of probation on and after that committed sentence. He was released from state prison in 2012. He successfully completed the three-year term of probation without a single violation of probation.

While on probation and since that time Mr. Santos has had a consistent work history. He worked in various positions where he could find work, from office work in 2013, to setting up tents and awnings in 2015, to seasonal positions with Ikea, to the position he held when he was arrested here – a position he held at a company called Cri-Tech in Hanover. He worked at Cri-Tech from April of 2019 until his arrest in February.

Mr. Santos was originally arrested on the matter before the court in October of 2018. He was released on a bail of $10,000 and a GPS device. In the 18 months Mr. Santos was out on conditions of release there were no issues outside the claim the government now makes that Mr. Santos was involved in this other matter.

### C.  COVID-19 Outbreak

As of April 20, 2020, the new strain of coronavirus, which causes an illness called

4

COVID-19, has infected 2,402,076 people, leading to at least 165,106 deaths worldwide.[1] On March 11, 2020, the World Health Organization officially classified COVID-19 as a global pandemic.[2] On March 13, 2020, President Trump declared a national emergency to address the pandemic.[3] Governor Charlie Baker declared a state of emergency in Massachusetts on March 10, 2020.

To date, the pandemic has caused Governor Baker to issue at least 48 emergency orders.[4] Those orders range from closing all elementary and secondary schools to prohibiting on-site consumption of food and beverages to restricting visitor access to nursing homes to prohibiting public gatherings of more than 25 people. *Id*. On March 23 Governor Baker ordered all non-essential businesses to close. *Id.* Forty-two states, including Massachusetts, have issued "stay at home" or "shelter in place" emergency orders prohibiting non-essential travel and assembly.[5] At the time of the drafting of this motion, approximately 316 million Americans are subject to "stay at home" or "shelter in place" orders.

Following the lead of government officials, this Court has issued 16 General Orders relative to coronavirus, including continuing all jury trials that were scheduled to begin before

---

1 Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard (last accessed April 19, 2020), https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467b48e9ecf6.

2 WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020), https://bit.ly/2W8dwpS.

3 Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference (March 13, 2020). https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-conference-3/.

4 COVID-19 State of Emergency, https://www.mass.gov/info-details/covid-19-state-of-emergency.

5 Sarah Mervosh, Denise Lu and Vanessa Swales, "See Which States and Cities Have Told Residents to Stay at Home," New York Times, https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

May 29th, *see* General Order 20-13, and continuing all criminal hearings and deadlines other than motions for release or detention for 60 days, unless there is a case-specific liberty or public safety interest. *See* General Order 20-4. Other measures include postponing grand juries, civil mediation sessions and naturalization ceremonies, and restricting courthouse visitors.

All of these precautionary measures are designed specifically to keep people out of crowded places and to require "social distancing" to lessen the spread of the virus because it is highly contagious. The CDC advises that the virus passes through coughing and by contact with surfaces.[6] The available evidence indicates that the virus may remain on surfaces for up to three days. *See* Neeljte van Doremalen, et. al., *Aerosol and Surface Stability of SARS-CoV2 as Compared with SARS-COV-1*, New England Journal of Medicine (Mar. 17, 2020) ("SARS-CoV-2 was more stable on plastic and stainless steel than on copper and cardboard, and viable virus was detected up to 72 hours after application to these surfaces (Figure 1A)…").[7] To combat transmission, the CDC has issued guidance discouraging gatherings of more than 10 people in one place.[8] The CDC also urges social distancing—every person should remain at a distance of at least six feet from every other person.[9] The CDC now also recommends covering your mouth and nose with a cloth cover when going out in public.[10] Proper hygiene, including frequent

---

6  *See* "How It Spreads," Center for Disease Control and Prevention (last accessed 03/21/2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

7  Available at https://www.nejm.org/doi/10.1056/NEJMc2004973.

8  Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

9  *See* supra note 7; see also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020), https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

10  Center for Disease Control and Prevention, "How to Protect Yourself & Others,"

cleaning of all surfaces and frequent, thorough hand washing is also recommended.

The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated people or those who must interact with them. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. In prison, people are confined in close proximity to one another and to the staff. When people must share sleeping areas, dining halls, bathrooms, showers and other common areas, the opportunities for transmission are greater. In addition, there are reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and ill-equipped.

Compounding the problem, many people who are incarcerated also have chronic underlying health conditions, such as asthma, diabetes, hypertension, or HIV, that place them at elevated risk for contracting serious COVID-19. Incarcerated people have poorer health than the general population, and even at the best of times, medical care is limited in federal pretrial detention centers.[11]  But even healthy people who are not incarcerated have died from COVID-19.[12]

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[13]

---

https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed April 19, 2020).
[11]  Laura M. Maruschak et al. (2015). Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12. NCJ 248491. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf.

[12]  Nicoletta Lanese, "Why Are Young, Healthy People Dying from COVID-19? Genes May Reveal the Answer." March 31, 2010, available at https://www.livescience.com/genes-for-covid19-coronavirus-severity.html.

[13]   "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and

Medical professionals behind bars are sounding the alarm as well. *See* Craig McCarthy, "Top

Rikers Doctor: Coronavirus 'Storm is Coming,'" N.Y. Post (Mar. 19, 2020) ("[W]e cannot

change the fundamental nature of jail. We cannot socially distance dozens of elderly men living

in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each

day. . . .Please let as many out as you possibly can."). *See also* Jennifer Grannerman, "A Rikers

Island Doctor Speaks Out to Save Her Elderly Patients from the Cornoavirus," The New Yorker,

Mar. 20, 2020.

The magnitude of this risk of this crisis has grown exponentially day-by-day. As of April

18, 2020, the Massachusetts Department of Public Health reported 36, 372 confirmed cases of

COVID-19 in Massachusetts.[14] 1,560 deaths attributed to COVID-19 have been reported

throughout the Commonwealth. Of those confirmed cases, 9,596 involve persons under the age

of 40.[15] The numbers are climbing each day.

As of April 18, 2020, the Rhode Island Department of Health reported 4,491 persons

testing positive or presumptively positive for COVID-19.[16] To date, Rhode Island reports 137

deaths associated with COVID-19.[17] In 10 days the number of positive cases has doubled. The

number of tests also doubled.

The risk of infection stems from the widely reported insidious infection rate of the

disease, coupled with its ability to survive both in the air and on non-porous surfaces.   As

---

Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2,
2020), at https://bit.ly/2W9V6oS.
14 "Coronavirus disease (COVID-19) Cases in MA" available at https://www.mass.gov/doc/covid-19-cases-in-
massachusetts-as-of-april-18-2020/download.
14. Id.

16   https://health.ri.gov/data/covid-19/
17   Id.

reported in a letter by researchers published in the New England Journal of Medicine, viable virus was detected on plastic and stainless steel surfaces up to 72 hours after application to those surfaces in a research setting, while the virus remained viable in the air for up to 3 hours.[18]

While it has largely been reported that those with underlying medical issues and older populations are at heightened risk for death or serious complications from COVID-19, young people remain at risk for contracting serious illness and death, or facilitating the serious illness or death of others by spreading the disease while infected but not feeling the effects of the disease. Indeed, World Health Organization Director-General Tedros Adhanom Ghebreyesus cautioned recently, "I have a message for young people: You are not invincible, this virus could put you in hospital for weeks or even kill you. Even if you don't get sick the choices you make about where you go could be the difference between life and death for someone else."[19]

The large, confined population at the jail make it no better than a cruise ship[20] or nursing home[21] or a shelter[22] – places where the virus has run rampant. The facility is an environment in which the COVID-19 virus can easily gain a foothold and, when it does, spread rapidly jeopardizing the life and safety of Mr. Santos. On Rikers Island in New York, 167 inmates and

---

18  Van Doremalen et al. "Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1" available at https://www.nejm.org/doi/10.1056/NEJMc2004973 (Last accessed on March 23, 2020).
19  "Coronavirus: Young people are not 'invincible', WHO warns" available at https://www.bbc.com/news/world-51982495 (Last accessed March 23, 2020).

20 Center for Disease Control & Prevention, COVID-19 and Cruise Ship Travel (last accessed March 21, 2020), https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-cruise-ship.

21  Los Angeles Times, Seattle-Area Nursing Home Deaths Jump to 13 with COVID-19 and 11 of Unknown Causes, https://www.latimes.com/world-nation/story/2020-03-07/nursing-home-coronavirus-deaths.

22  Naomi Martin and Hanna Krueger, "Three More Residents Die at Holyoke Soldiers' Home, Site of State's Largest Fatal Coronavirus Outbreak," Boston Globe, April 2, 2020, available at https://www.bostonglobe.com/2020/04/02/metro/three-more-residents-die-holyoke-soliders-home/.

114 staff have tested positive. *See* Schuppe, Jon, "Prisoners in New York City Jails Sound Alarm as Coronavirus Spreads: 'I Fear for My Life,'" (Mar. 30, 2020), https://www.nbcnews.com/news/us-news/prisoners-new-york-city-jails-sound-alarm-coronavirus-spreads-i-n1172306. In the Bureau of Prisons, 22 inmates have died from the virus, 495 other inmates have tested positive, and 309 staff have tested positive. *See* Federal Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus.

In China, officials have confirmed that the coronavirus spread at a rapid pace in Chinese prisons, counting 500 cases.[23] Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[24] In the United States, in light of growing cases, including the first death of a BOP inmate from COVID-19,[25] steps are being taken in some jurisdictions to facilitate the release of elderly and sick prisoners and to reduce jail populations by discouraging the admission of individuals arrested on non-violent misdemeanor charges. *See, e.g.,* Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, Wall Street Journal (Mar. 22, 2020). This is happening in Massachusetts as well. *See Citing Risk of Coronavirus Spread, DA Rollins Seeks Release of Many Suspects From Custody*," WCVB Channel 5 (Mar. 20, 2020), https://www.wcvb.com/article/citing-risk-of-coronavirus-spread-da-rollins-seeks-release-of-many-suspects-from-custody/31781799#.

---

23 Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

24 *Coronavirus: Iran Temporarily frees 54,000 prisoners to combat spread,* BBC News, (Mar. 3, 2020), https://www.bbc.com/news/world-middle-east-51723398.

25 Lynch, Sarah N., "Prisoner Serving Time for Drug Charge is First U.S. Inmate to Die from COVID-19," (Mar. 18, 2020), https://www.reuters.com/article/us-heath-coronavirus-prison-death/federal-inmate-serving-time-for-drug-charge-is-first-inmate-to-die-from-covid-19-idUSKBN21G04T.

10

**(a) Massachusetts Correctional Facilities.**

In March 2020 the Committee for Public Counsel Services, with the ALCU of Massachusetts and the Massachusetts Association of Criminal Defense Attorney's filed suit in the Supreme Judicial Court alleging, *inter alia*, that as a threshold matter the Massachusetts Department of Correction were not equipped to confront the COVID-19 emergency, and that certain inmates should be released.

As a result of the Supreme Judicial Court's order in *Committee for Public Counsel Services v. Chief Justices of The Trial Court*, (SJC-12926), the Massachusetts Department of Correction and county jails have released statistics that lay out all of the testing in Massachusetts correctional facilities.[26] While some counties are reporting zero confirmed cases, they – like Bristol County for instance – are not reporting any testing on inmates. Conversely, in the Essex County Jail more than half of the inmates tested (63) had positive results (35).

The data being reported confirm a trend in other available data; that is, when large swaths of people living in confined spaces were tested for COVID-19, the number of confirmed cases jumps in some cases by 50%.

The report of testing of those living in the shelter at the Pine Street had "stunning" results was supportive of high occurrence of transmission in populations that were confined to living in small spaces.[27] According to a report that 240 homeless residents tested positive for COVID-19, representing about 25 percent of the total population, and well more than half of those were

---

26  Data, updated daily, available at https://data.aclum.org/sjc-12926-tracker/.
27  See WBUR, Testing reveals 'Stunning' Asymptomatic Coronavirus Spread Among Boston Homeless https://www.wbur.org/commonhealth/2020/04/14/coronavirus-boston-homeless-testing

asymptomatic.[28]

**(b) Donald J. Wyatt Facility**

In the Donald J. Wyatt Detention Facility, where the defendant is being held, the defendant reports that up until recently the guards were not wearing masks and there were no hand sanitizers available for the inmates. Social distancing is impossible. Mr. Santos is in a cell with another inmate. The cell is small, about 10' x 14'. In his shared cell, he and his cellmate share a toilet and a sink. They eat in an area where at least four other inmates are at the table with him.[29]

Although the Federal Bureau of Prison has released information about the number of positive cases (including positive test results for staff) in individual facilities – Wyatt is not listed included in that information.[30]  It is therefore impossible to know exactly how many inmates and staff are infected because there is no information available about how many people – if any- are being tested for COVID-19.However, information will be released by Monday, April 20th in response to an order of the United States District Court for the District of Rhode Island.[31]That information will include the number persons tested, and the results of those tests, as well as measures the facility is taking to curb the spread of the disease.

**(c) Response of Congress and the Federal Courts.**

Realizing that a crisis is looming, voices in Congress are calling on the Department of

---

28  See Boston Globe, The 'surprising' number of asymptomatic COVID-19 cases in Boston's homeless shelters has advocates scrambling, https://www.boston.com/news/local-news/2020/04/16/boston-homeless-care-covid-19-update

29  See attached Affidavit of Chris Santos.

30  See Federal Bureau of Prisons Coronavirus Updates https://www.bop.gov/coronavirus/
31  See Chief Justice McConnel's April 16 Order
https://www.rid.uscourts.gov/sites/rid/files/Wyatt_General_Order.pdf

Justice to "do all they can to release as many people as possible who are currently behind bars and at risk of getting sick." *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to Attorney General William P Barr ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action.");[32] *see also* March 19, 2020 Letter from Senator Kathleen Harris to BOP Director Michael Carvajal (noting that "[e]merging research has demonstrated how dangerous coronavirus is for the elderly and those with underlying conditions and compromised immune systems" and urging BOP to "tak[e] reasonable steps t reduce the incarcerated population and guard against potential exposure to coronavirus").[33]

Federal courts are also recognizing the risk and releasing people from confinement to mitigate their risk of infection and severe illness or death. Many courts are releasing pretrial detainees. *See United States v. Mclean,* No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously

---

32 Available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf.

33  Available at https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf. *See also* March 9, 2020 letter from fifteen United States Senators to BOP Director Carvajal, https://www.warren.senate.gov/imo/media/doc/2020-03-09%20Senator%20Warren%20Letter%20to%20BOP%20re%20Coronavirus.pdf. *See also* Mark Hallum, *Three New York Congress members tell feds to spring non-violent offenders from jail*, AMNY (Mar. 22, 2020), https://www.amny.com/coronavirus/three-new-york-congress-members-tell-feds-to-spring-non-violent-offenders-from-jail/.

weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic").

Courts are also releasing individuals after conviction, including those who have begun serving their sentences. *See United States v. Grobman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla.

Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of

"extraordinary situation of a medically-compromised detainee being housed at a detention center

where it is difficult, if not impossible, for [the defendant] and others to practice the social

distancing measures which government, public health and medical officials all advocate");

*United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea

presentence release of defendant whose pretrial release was revoked because "the COVID-19

pandemic constitutes an independent compelling reason" for temporary release and "is *necessary*

for Defendant to prepare his pre-sentence defense"); *United States v. Powell*, No. 1:94-cr-316-

ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release

in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust in

light of open misdemeanor case); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020)

("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis

continues to expand poses a far greater risk to community safety than the risk posed by

Defendant's release to home confinement on . . . strict conditions."); *United States v Garlock*,

No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos"

inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes

without saying that we should not be adding to the prison population during the COVID-19

pandemic if it can be avoided"); *In re Request to Commute or Suspend County Jail Sentences*,

Docket No. 084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in

county jail "in light of the Public Health Emergency" caused by COVID-19); *United States v.

Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020)

(extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*,

2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility"); *United States v. Copeland,* No. 2:05-cr-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

Courts are releasing immigration detainees as well. *See Jimenez v. Wolf*, No. 18-10225-MLW (D. Mass. Mar. 26, 2020) (ordering release of immigrant detainee in the midst of the COVID-19 pandemic and noting that "being in a jail enhances risk" and that in jail "social distancing is difficult or impossible"); *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis"); *Coronel v. Decker*, 20-cv-2472-AJN, Dkt. No. 26 (Mar. 27, 2020) (granting TRO and releasing from immigration detention facility in light of COVID-19); *Basank v. Decker*, 20-cv-2518 (S.D.N.Y. Mar. 26, 2020) (same); *Basank v. Decker*, No. 20-cv-2518, (S.D.N.Y. Mar. 26, 2020) ("*[t]he nature* of detention facilities makes exposure and spread of the [coronavirus] particularly harmful" so granting TRO and releasing high-risk plaintiffs); *In the Matter of the Extradition of Alejandro Toledo Manrique*, Case No. 19-mj-71055, 2020 WL 1307109, at *1 (N. D. Cal. March 19, 2020) (ordering change to conditions of bail for an individual to postpone incarceration, in part in light of risk of vulnerability to the coronavirus).

## II.  LEGAL ARGUMENT

A "judicial officer may, by subsequent order, permit the temporary release of the person,

in the custody of a United States marshal or another appropriate person, to the extent that the

judicial officer determines such release to be necessary for preparation of the person's defense or

for another compelling reason." 18 U.S.C. § 3142(i). *See also United States v. Angiulo*, 755 F.2d

969, 972-73 (1st Cir. 1985) (holding that the magistrate who issues a detention order has inherent

authority to reconsider that order). Compelling reasons may exist where release is necessary for

the preparation of the defendant's defense, see 18 U.S.C. § 3142(i), or where the defendant's

serious medical conditions warrant release, *see, e.g., United States v. Rebollo-Andino*, 312 F.

App'x 346, 348 (1st Cir. 2009) (explaining that a defendant who is denied bail "retains the

ability to request[,] . . . in extraordinary circumstances, . . . temporary release under § 3142(i)"

should future developments with respect to his medical conditions so warrant).

The circumstances that existed when was ordered detained have now drastically changed.

There is a pandemic that poses a direct risk to Mr. Santos that is far greater if he continues to be

detained during this public health crisis. He is particularly vulnerable to coronavirus because of

the conditions of his confinement. Continued incarceration seriously jeopardizes his health and

life.

### A. The Bail Reform Act Empowers This Court to Release Chris Santos for COVID-19 Related Reasons.

As an initial matter, the Bail Reform Act requires that a court should "bear in mind that it

is only a 'limited group of offenders' who should be denied bail pending trial." *United States v.*

*Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. No. 98-225 at 7, as reprinted in 1984

U.S.C.CA.N. 3182, 3189); *see United States v. Salerno*, 481 U.S. 739, 755 (1987) (suggesting

that "detention prior to trial or without trial is the carefully limited exception" to liberty before

trial). One charged with a crime is, after all, presumed innocent. *See generally Stack v. Boyle*,

17

342 U.S. 1, 4 (1951). Due to the crucial interests involved, it follows that a "case-by-case"

approach is required at any stage of the case in assessing the propriety of pretrial detention. *See*

*United States v. Gonzales-Claudio*, 806 F.2d 334, 340 (2d Cir. 1986) (discussing due process

analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake)

(citations omitted), cert. dismissed sub nom., *Melendez-Carrion v. United States*, 479 U.S. 978

(1986).

Courts have long recognized that there is no greater necessity than keeping a defendant

alive, no matter the charge. As Judge Weinstein held, "We do not punish those who have not

been proven guilty. When we do punish, we do not act cruelly. Continued incarceration of this

terminally ill defendant threatens both of these fundamental characteristics of our democracy."

*United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing

murder charges released on bail because of the "unacceptably high risk of infection and death on

a daily basis inside the MCC"). Thus, even in cases where there is a presumption of

dangerousness, release may be appropriate to safeguard a defendant's health and life. *See, e.g, Id*.

*See also United States v. Cordero Caraballo*, 185 F. Supp. 2d 143, 146 (D.P.R. 2002) (defendant

charged with assaulting and attempting to kill federal agent released to custody of his relatives

because "[n]otwithstanding the defendant's apparent dangerousness in this case, his present

condition is indeed grave and can deteriorate if not carefully treated. At present, the Bureau of

Prisons cannot provide the necessary medical care defendant requires."); *United States v.*

*Johnston*, 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with violation of the

Mann Act and in need of prompt treatment due to colon cancer released to custody of his wife

for 21 days, despite institution's averment that it could provide medical care); *United States v.*

*Adams*, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with violation of the Mann Act and possession of child pornography and suffering from diabetes, heart conditions and open sores released on home detention because of his medical conditions).

Thus, this Court should consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Santos will yield, relative to the heightened health risks posed to him during this rapidly encroaching pandemic. *See generally United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016) (Weinstein, J.) (in sentencing context, observing that a trial judge "cannot close his or her eyes to the conditions a particular defendant . . . will necessarily experience in prison"); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Franci*s, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention).

In Mr. Santos' case, he is currently subject to a detention order pursuant to 18 U.S.C. § 3142. Under subsection (b)(2), a court issuing an order of revocation and detention must find that, "A) based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or (B) the person is unlikely to abide by any condition or combination of conditions of release."

The defendant asks this Court to consider the "total harm and benefits to prisoner and society" that continued pretrial imprisonment of Mr. Santos during this pandemic will yield, relative to the heightened health risks posed to Ms. Santos and inmates and staff at Wyatt Detention Facility during this rapidly encroaching pandemic. *See United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant).

**B. There Are Conditions of Release That Reasonably Assure the Safety of the Community.**

The Bail Reform Act requires the Court to impose "the least restrictive [] condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B).

Mr. Santos is not a flight risk. He was released on bail on the charges before the court in which he was facing a mandatory minimum of 5 years. He never absconded. As acknowledged by the government the only reason Mr. Santos was being held is due to the January 28th incident for which he is not indicted or charged and we know so little about.

Mr. Santos was previously released with GPS monitoring device. At that time he did not have a curfew. At this time, given the new allegations we would propose he be released to his mother's home in Brockton. We suggest that any fears of danger to the community can be allayed by an order of home confinement. Such an order represents an understanding of the

seriousness of the allegations against him while also permitting Mr. Santos to await the charges

and not be exposed to this dangerous virus. The home is large enough for him to quarantine in

the home without exposing himself to others in the home.

## CONCLUSION

Wherefore, Christopher Santos moves this Court to grant the following relief:

A.    Hold an emergency hearing on this motion as soon as possible; and

B.    Allow the Defendant to appear by video; and

C.    Grant this motion and release the Defendant on conditions set forth above as well as any additional conditions that the Court deems necessary; and,

D.    Grant such further relief as is just.

Christopher Santos
Respectfully Submitted
By his attorney

/s/ Brian A. Kelley-_____
Brian A. Kelley
161 Granite Avenue
Boston, MA.
617-720-0019
brian@bakelleylaw.com

## CERTIFICATE OF SERVICE

I, Brian Kelley, hereby certify that this document filed through the ECF system will be sent electronically to the registered participant(s) as identified on the Notice of Electronic Filing (NEF) on April 21, 2020.

/s/ Brian A. Kelley