UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIM. NO. 20-10084-RGS |
| CHRISTOPHER SANTOS, | ) | |
| | ) | |
| Defendant | ) | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR RELEASE

The government respectfully submits its opposition to Defendant's Emergency Motion to Reconsider Pretrial Release on Conditions Based on Changed Circumstances and COVID-19 Pandemic (the "Motion"). The government opposes the Motion. This Court previously determined that the defendant poses a sufficiently great danger to the community that no condition or combination of conditions can be fashioned adequately to protect the community or any person. There were two reasons undergirding this decision. First, this defendant has an unfortunate but clear penchant for possessing guns illegally. Second, notwithstanding the defendant's contrary claims, there is strong evidence that the defendant, while on release for the state court version of this case and while wearing a court-ordered GPS bracelet, participated in an extremely serious conspiracy to rob a Mexican cartel of 10 kilos of cocaine. Specifically, this Court said in its detention order:

> The government has met its burden on dangerousness, however, because at the detention hearing, the government presented credible evidence that Mr. Santos, while on release from this offense charged in state court, and while wearing an ankle monitor, was ready to participate in the crime of robbing a drug stash house, as part of a sting the government has set up with two other men. While, as defendant pointed out at the hearing, the evidence the government has is not ironclad, nevertheless it certainly appeared to the court that Mr. Santos was in the area where the other two men were, at the right time to participate in the purported robbery, and there are texts between the men and

1

other evidence that indicate that Mr. Santos was ready to be part
of that crime.

In addition, Mr. Santos has a history of firearms, including a
conviction from 2010 where he served 2.5 years for possession of
a firearm with a large capacity feed, and another from when he
was a juvenile, for possession of a loaded firearm.  The
government's evidence here is overwhelming.  He appears not to
be able to resist possessing firearms, although it is illegal for him
to do so.

The coronavirus, while certainly a serious concern for everybody, and especially

inmates, does not alter the fact that the defendant is a danger and has a proclivity for possessing

guns.  The Court should deny the Motion.

## BACKGROUND

### Charged Offense

As the Court observed, the evidence against the defendant on the currently-pending

charge – being a felon in possession of a firearm and ammunition – is overwhelming.  While

admitting that he possessed a gun on that occasion, the defendant indicates that he was stopped

in a motor vehicle in Brockton that was "suspected" of being in a car accident, and that when

the defendant was "pat frisked a firearm was found on his person."  Motion at 1-2.  The police

report regarding this incident was introduced at the detention hearing.  It is clear from the report

that the motor vehicle was not "suspected" of being in an accident but instead that the vehicle,

driven by the defendant, was *in fact* in an accident when, shortly after 1:00 a.m., it struck a car

parked on the side of the road with sufficient force that people came out of their homes to see

what had happened.  And while the police did feel the gun in the defendant's pocket as the

result of a pat-frisk, this occurred after the defendant repeatedly ignored police commands, had

tried to open the rear door of the car when he was supposed to walk to the rear, and ultimately

2

ended up being taken to the ground because of the concerns raised by his conduct.

**The Conspiracy**

In describing the evidence against him with respect to the conspiracy to rob a Mexican drug cartel, the defense makes several mistakes, none of which the government believes are intentional but instead the product of the lapse of time since the hearing. They do, however, show the value of having a transcript of the proceeding.

While the government will recount in much greater detail the evidence of the defendant's participation in the conspiracy, it begins by reminding the Court of the broad outlines of the plot. In October 2019 an ATF cooperating witness ("CW") who had heard Keith Cousin was seeking drug houses to rob reached out and told him of (a fictional) opportunity. This ultimately blossomed into a meeting between Cousin, the CW, and an undercover agent ("UC") at a hotel near Logan Airport in early January 2020, followed the next day by a meeting that included the same people and a fourth: Rico Perry. Ultimately the purported robbery was set for January 28, 2020. The government did, as the defense states, introduce a report of what occurred that day from the perspective of the UC. Cousin and Perry were arrested that day. The defendant was not.

The defendant claims, however, that he *was* arrested three days later, after agents questioned him after a hearing at Plymouth District Court and then at his home, and after they searched his home and car pursuant to the defendant's consent. Motion at 2-3. That is not true. The defendant was not arrested until February 13, 2020. [Docket 2/13/20]. The defendant also notes that statements he made to agents the day they spoke to him were not in the report. Motion at 3. But the report was written with respect to events that occurred three days earlier.

Because the defense appears in general to be questioning the defendant's involvement in

the conspiracy, which he claims "we know so little about," Motion at 20, the government will now provide a more complete summary of the conspiracy and of the defendant's involvement.

On January 7, 2020, Cousin met with the CW and an ATF undercover agent ("UC") who was posing as a disgruntled courier for a drug cartel that was expanding its operations into the Boston area. The meeting was recorded. The UC was seeking assistance in robbing the cartel of 10 kilograms of cocaine. Cousin and the CW had previously discussed this opportunity but this was the first time Cousin had met the UC. The UC told Cousin, in substance, that he delivered cocaine for the cartel; that the cartel used a different stash house on each occasion that the UC performed a delivery; that the UC never learned the location of a particular stash house until shortly before he was to pick up the drugs; that every time he arrived at a stash house the same two members of the organization were there, at least one of whom was armed with a pistol; that the UC would pick up 2 kilos for delivery but would see that 10 kilos were there; and that only when he had been given the 2 kilos he was to deliver was he told the location to which he was to make the delivery.  During the meeting, which took place in the CW's car as he was transporting the UC from Logan Airport to a nearby hotel, Cousin expressed his understanding of and interest in participating in the robbery, ultimately telling the UC that the UC could not have not picked someone better and that he understood he was dealing with people whom "the cartel entrusted to watch they drugs" and that there would definitely have to be some type of "hostile takeover."

On the next day, the same three men met at the hotel. This time Perry, whom Cousin had recruited, was present.  The meeting was recorded. The UC provided the same information to Perry as he had provided the previous day to Cousin. Perry, like Cousin, expressed his understanding of and interest in participating in the robbery. During the UC's explanation, Cousin told Perry that this meeting was necessary because, "When it comes to life changing

4

situations, it's that much more in the planning." Cousin then said, "If you ain't planning, you planning to fail." Cousin and Perry then discussed how the robbery should be committed. Cousin proposed that they simply "rob" the UC of the 2 kilos he was given because it was a sure thing, but Perry objected, indicating that would put the UC in danger with the cartel, and stated, "I'm going in there… I ain't playing."  Perry added that upon entering the house, he immediately wanted to put a "gun" to the first guard's head, take him "hostage," and use him as a "shield" so that the guards could be subdued, so as not to "let off a shot".  During the meeting the UC had Cousin and Perry confirm that they would not sell the cocaine they acquired through the robbery with the cartel stamp still present and both men confirmed they would not do so. Perry said that the cocaine he obtained was going "straight to the stove," i.e., would immediately be converted to crack cocaine.  At the end of the meeting Cousin told the UC that this type of job would require two men with "machineguns" and a third man with a "handgun." Perry did not disagree.

A gram of cocaine has a street value of approximately $100.   A kilogram of cocaine thus has a street value of approximately $100,000, and ten kilograms a street value of approximately $1 million.  In this case the UC told Perry and Cousin that the cartel's cocaine was "pure."  Because cocaine ordinarily is "cut" with another substance before being sold on the street, the street value of pure cocaine would be significantly higher, depending on the amount of "cut" ultimately added to it.

The UC set the proposed robbery for January 28, 2020. There was testimony at the detention hearing regarding of the events of that day, including the arrest of Cousin and Perry. The report the defendant referred to in the Motion, which was introduced as an exhibit at the hearing, summarized those events from the point of view of the UC.  His interactions that day with Cousin and Perry were recorded. As the Court may recall, both Perry and Cousin were

suspicious of the UC that day, apparently because when they arrived in the area of the Hilton Garden Inn in East Boston where their initial meeting that day was supposed to take place, they "made" a police surveillance vehicle. The UC provided them with another location at which to meet – a CubeSmart located on McClellan Highway. When Cousin and Perry arrived at that location in a blue Honda the UC asked if they were "ready" and had their "guns and everything." Perry responded affirmatively and said that when they were doing this type of business they did not carry their wallets or anything else with them. The UC asked Cousin if it would be just him and Perry, and Cousin said there was one more crew member, who was the "driver," who had the firearms and was "right around the corner." The UC indicated the driver should come to the CubeSmart but met with resistance. They all then got into the UC's vehicle, where Perry started asking why the UC's "beanie" looked like it had a brim inside it and wanted the UC to give it to him. When the UC demurred Perry and Cousin got out and walked toward the Honda. The UC got out and asked whether they were "cool," saying that "I just want you guys to be cool with it, and if you not, then you not.  You know, like?  It's up to you guys." Cousin said they were "cool" and then he and Perry got into the Honda and drove off. A few minutes later the UC called Cousin to ask if they were "good." Cousin said he was going to get the third member of the crew and would be returning shortly. The UC said, "If you all still with it, grab your mans and come back.  If not, it's all good, you feel me?"  Cousin said, "Yeah."

Ultimately Cousin and Perry returned on foot, having parked the Honda a short distance away. During this meeting, the UC asked Cousin if he had brought the third member of the crew, and Cousin indicated he had not and said that since there was so much "confusion" they no longer needed the third member. Perry then returned to the subject of the "beanie" and continued to express concern about it. They all then entered an empty storage unit that the UC had rented as a rendezvous location for after the robbery.  Cousin said he and Perry had "bad

6

nerves," especially after seeing the law enforcement vehicle, and the UC indicated everyone had "nerves." Cousin and Perry disrobed to the extent necessary to show they were not wearing wires. Cousin said that was what was supposed to be done "as men," and Perry said he just wanted to "make it home" and "benefit." The UC then did the same, warning Cousin that he did have a firearm. The UC then turned his hat inside-out to show there was nothing behind the brim.  Cousin said that made him feel "so much better," and Perry agreed, stating "I ain't going nowhere.  We'll get the job done."

Shortly thereafter Perry started speaking on his cell phone with someone whose nickname the UC understood to be "Trick" but, based on information provided below, was actually "Trigg."  As shown below, Trigg is the defendant.  At the end of the conversation Perry told Cousin, "We just gotta grab him." It was clear at this point that Trigg – the defendant – was the driver and Cousin and Perry had not, in fact, decided to proceed without him. Cousin and Perry started walking toward a vehicle that the UC had provided for their use in the robbery. Perry shouted to the UC that they would be right back.

They were arrested either as they were entering or had just entered the vehicle.

EVIDENCE REGARDING THE DEFENDANT

Text Messaging Between Perry and the Defendant

After the arrest of Cousin and Perry, ATF recovered their cell phones. Believing there was an individual in the immediate area who was potentially in possession of machineguns and other firearms, and given the exigent circumstances thus presented, ATF searched the cell phones just for information from that day to determine if there had been contact with someone who might be the driver. ATF saw some text messaging on Perry's phone with an individual identified as "Trigg."  The messages took place over time, between 6:46 a.m. and 12:26 p.m.:

1/28/2020 6:46AM
PERRY:        "What we looking like"
Trigg:  "Js charging up my leg be there in 25min"
PERRY:        "Ok cool"
Trigg:  "Im outside"
PERRY:        "Yeah come up stairs I happen to just be looking"
Trigg:  "Ight"[1]
Trigg:  "Im at the door"
Trigg:  "Downstairs"
1/28/2020 12:26PM
Trigg:  "Wtw we feeling to make move cuz"
PERRY:        [Began to type] "150" [but did not send message]

The term "charging up my leg" is vernacular for charging a GPS monitor.

Law Enforcement Follows Wrong Vehicle

There was a phone number associated with these messages. However, agents had observed a particular vehicle in the area of the undercover operation and saw the driver on his cell phone at the same time as either Cousin or Perry. Believing this could be the driver, law enforcement followed the vehicle to a location in Lynn and then sat outside a home watching it. Ultimately a woman came out of the residence and entered the car, and it was pulled over. It became apparent that the person the agents had seen, the women's son, worked at or near Logan Airport and had been in the area to pick up a check. By this time the opportunity to find the driver in real time had been lost.

The Defendant's Phone and Vehicle

However, agents learned the identity of the subscriber to the phone number associated with the text messages. It proved to be the defendant. RMV records showed that the defendant

---

[1] "Ight" is short for "alright."

8

has a black BMW registered to him. As indicated above and at the defendant's detention hearing, Cousin told the UC and the CW that he had seen a black SUV that he believed to be a law enforcement vehicle near the hotel parking lot. ATF Special Agent Daniel Campbell was in fact present near the Hilton Garden Inn parking lot prior to the arrival of the UC that morning and observed a black BMW SUV parked on a street near to, and with a view of, the parking lot where the meeting was supposed to occur. SA Campbell observed Cousin exit his Honda, look in the direction of the BMW, approach in the direction of SA Campbell, and then return to his vehicle. Once inside of his vehicle, Cousin and the BMW simultaneously drove away.  Based on the evidence below, the person driving the BMW was clearly the defendant.

        Evidence from the Defendant's Court-Ordered GPS Monitoring

        ATF agents also ran a criminal history for the defendant. They learned not only that he has a criminal history, including convictions for drugs and firearms, but also that he had an open state firearms case at the time and was wearing a court-ordered GPS monitor.  ATF obtained information for the defendant's movements on January 28, 2020 from the Massachusetts Probation Services Electronic Monitoring Program ("ELMO"). It showed the following, among other things.

        As indicated above, the defendant replied to Perry's text at 6:37 a.m. by indicating that he was charging his GPS monitoring bracelet and would "be there in 25min." Per ELMO data, sequential GPS readings for the defendant on January 28 at 6:00:00 a.m., 6:00:37 a.m., 6:21:18 a.m., and 6:47:36 a.m. put him at the same location, with a speed of zero, near an address in Brockton, MA, indicating he was at home and not moving.

        The next set of sequential ELMO GPS data readings are from 6:53:53 a.m. to 7:28:13 a.m. and depict a general path of movement from Brockton to Quincy, MA (Winter Street). As

set forth above, the defendant texted Perry early in the exchange that he would "be there in 25min," and sometime later the defendant texted Perry, "Im outside." The next set of sequential ELMO GPS data readings are from 7:35:45 a.m. to 8:31:38 a.m. and reveal the same coordinates in Quincy, MA (Winter Street) with a speed of zero, indicating the defendant was not moving. Investigation into Perry revealed that a particular woman was listed on Perry's Inmate Web jail profile as a "friend" with an address on Winter Street in Quincy. Perry's Massachusetts Driver's License also lists this Winter Street address in Quincy as a mailing address.

The ELMO data points from 9:41:33 a.m. to 9:52:33 a.m. show that the defendant traveled toward the Woodville Street area, where he was stationary from 9:46:33 a.m. to 9:48:33 a.m., and that he then continued toward Creston Street in Roxbury.  From 9:53:33 a.m. to 9:59:34 a.m., GPS coordinates put the defendant at the same coordinates, with a speed of zero, in the area of Creston Street in Roxbury. Further investigation into Perry via the Accurint LexusNexus Database revealed that an address on Creston Street is a previous residential address associated with Perry.

At approximately 11:04:16 a.m. the defendant continued his travel through the Ted Williams Tunnel, exiting the tunnel at approximately 11:06:49 a.m. At approximately 11:07:49 a.m. the defendant was travelling north on Route 1A in East Boston.  From 11:18:50 a.m. to 11:24:50 a.m., the defendant left the area of Faywood Avenue and Orient Avenue and traveled to the area of the Hilton Garden Inn on Boardman Street in East Boston. From approximately 11:25:50 a.m. to 11:29:49 a.m., the defendant was stationary on Leyden Street, across from the Hilton Garden Inn. It is at this point in time, and at approximately the same location as previously mentioned, that SA Campbell observed a black BMW SUV leave the area simultaneously with Cousin, after Cousin mentioned seeing a law enforcement vehicle in the

area. SA Campbell observed the vehicle exit northbound onto route 1A, a/k/a the McClellan Highway, and from 11:30:39 a.m. to 11:32:49 a.m., GPS points show that the defendant left the area of Leyden Street and again traveled north on Route 1A.

EMLO GPS location data show that the defendant then remained in the same immediate area, circling the streets near to Cousin's and Perry's meetings with the UC, until 1:12 p.m., right after Cousin and Perry were arrested at approximately 1:06 p.m. At 1:12:44 p.m. GPS points show that the defendant began to head south on Bennington Street, and that he then drove back to Brockton. He made one short stop in Boston along the way at a location that was not covered by surveillance cameras. The defendant arrived in the area of his Brockton address at approximately 2:34 p.m. and stayed there until the last entry on his ELMO GPS data at 10:00:00 p.m.

<u>Evidence from Police and Private Business Surveillance Systems</u>

ATF has also obtained surveillance camera footage relevant to the events of January 28, 2020.  In particular, ATF obtained footage from two privately-operated surveillance systems near the address on Winter Street in Quincy referred to above. Between them, the footage shows that at around 7:27 a.m. a black SUV drove in front of the address on Winter Street associated with Perry and parked in the parking lot between that address and another on Winter Street. Shortly thereafter, the defendant got out of the vehicle and walked to the front door of the other address on Winter Street. He was not carrying anything. The defendant entered the front entryway and waited until he was granted access. He then walked through the lobby, past the elevators, and entered the stairwell.  He walked to the second floor and entered the first apartment on the left.

At around 7:57 a.m., Perry exited this same apartment, walked down the stairwell, and

exited via a side door.  Perry returned to the apartment, left, and then returned again.

At around 8:33 a.m., both Perry and the defendant left the second-floor apartment, entered the stairwell, and walked down to the first floor.  The defendant was now carrying a bag in his right hand and a brown item that appeared to be a jacket in his left hand, while Perry was carrying a car seat. They both exited via the side door. The defendant went to his black SUV with the bag and the brown item, and Perry entered the Winter Street address associated with him with the car seat.

At around 8:39 a.m. Perry left an apartment in the Winter Street building associated with him and then left the building. He got into the defendant's SUV and they left the parking lot at around 8:40 a.m.

At around 9:52 a.m., a Boston Police surveillance camera captured the defendant's car on Creston Street in Boston. It stopped on Creston Street and a man consistent in appearance with Perry got out of the vehicle and entered a building, and then returned to the defendant's vehicle, which then left the area.

ATF also obtained video surveillance footage from cameras in the area of the meetings with the UC: a Burger King located at 944 Bennington Street in East Boston, and an East Boston Savings Bank located at 856 Bennington Street in East Boston. The video footage shows the following, among other things.

At 11:44 a.m. a black BMW consistent with the defendant's car arrived at the Burger King parking lot and parked.

At 11:54 a.m., after the UC had texted Cousin the address for the CubeSmart, Perry left a Subway located two stores away from the Burger King and got into the black SUV.

At 12:07 p.m., Cousin's blue Honda arrived in the Burger King parking lot and parked

next to the BMW.

At 12:09 p.m., Cousin's vehicle, which now also contained Perry, left the parking lot. According to other information in the investigation, they arrived at CubeSmart at 12:14 p.m. and left at 12:23.

At 12:26 p.m. Cousin's car returned to the Burger King parking lot. Cousin and Perry got out a minute later. At 12:28 p.m., Cousin went into the Burger King and Perry got into the BMW. Two minutes later Perry went into the Burger King.

At around 12:43 p.m., Cousin's vehicle left the Burger King parking lot. The defendant's car left the parking lot at around 12:44 p.m.

At around 12:45 p.m. Cousin's vehicle entered a gas station and Cousin appeared to pump gas. The car departed the gas station about a minute later.

There is no further surveillance footage depicting the defendant's vehicle after this point, although as indicated above ELMO monitoring shows that he was in the area until after the arrest of the Cousin and Perry.

Preliminary Cell Phone Information

As indicated above, Cousin's and Perry's cell phones were recovered at the time of their arrests. The extractions from the phones pursuant to search warrants were not available until the afternoon of March 23, 2020, owing to coronavirus-related staffing issues at the ATF laboratory. As of the morning of March 24, 2020, a very preliminary examination, primarily of Cousin's phone, included the following.

First, on the day before the robbery was to take place, Cousin was engaging in internet searches regarding firearms, interspersed with some telephone conversations. This extraction report was attached as Exhibit A to the Government's Further Proffer [Docket 48] in Cousin's

and Perry's case with the pages marked A-0001 to A-0007.  These searches appear to have begun at 1:09:05 a.m. on January 27, 2020, and ended shortly after 5:49:59 a.m.  Overall, the Web History is replete with searches regarding the shooting of various compact submachineguns, including but not limited to the MAC-11 (A-0001, Items 4, 7, 10-11), and the Cobray Arms M-11 (A-0001, Items 5 and 6).  These searches also include searches in general for various types of subcompact machineguns, including the Masterpiece Arms mini 9mm (MAC-11 Clone) (A-0001, Items 8-9); the MAC-11 with a laser scope (A-0002, Items 12-13); the MAC-11 with 100-round and 50-round drums (A-2, Items 14-18); and the MAC-11 and 9mm MAC-11 submachinegun (A-2, Items 21-23). These searches ultimately appear to have been interrupted by a call from Perry, referred to as "Coco," at around 5:52:29 a.m.  (A0007, Item 92).

These searches are significant because Cousin told the UC and the CW at the end of the meeting at the Hilton Garden Inn on January 8, in the presence of Perry, that the robbery would require two men with machineguns and another with a handgun.  He also referred to the robbery as "life-changing."

Attached as Exhibit B to the Government's Further Proffer are internet photographs that reflect an extreme interest in firearms on the part of Cousin, including various types of subcompact machineguns.  The last two items are different, however: they appear to have been created on December 11, 2019 and to depict the cooking of crack cocaine.  (B-0013 to B-0014, Items 63-64).  Cousin and Perry are charged in Count Two of their indictment with conspiring to distribute and possess with intent to distribute 5 and more kilograms of cocaine, and Perry indicated at the February 8 meeting in the Hilton that his share of the cocaine was going "straight to the stove."

14

A preliminary review of text messages from Cousin's phone revealed some text messages on the morning of the "robbery," January 28, 2020, between around 6:16 a.m. and 8:47 a.m.  These messages were between Cousin and a person referred to herein as "Individual 1."  They begin with Individual 1 sending Cousin a text reading, "It's there under the stairs."  At around 6:17 a.m. Cousin responded, "15Min [sic] away," and at 6:18 a.m. Individual 1 said "Ok I put ur headphones in the bag to[o]."  There followed some text messages whereby Individual 1 sought to confirm that Cousin had "got it," which Cousin confirmed through a response at 8:46 a.m.  Cousin's phone was subject to a "ping" order at the time, and "pings" of the phone during the period of the texting generally showed Cousin to be in close proximity to Individual 1's home.  Given the timing of these messages and the cryptic nature of them, ATF believes it likely that the bag that Individual 1 left contained a firearm or firearms that either Individual 1 was providing or, more likely, was holding for Cousin.

ATF had even less time to examine Perry's phone before the filing of the Government's Further Proffer on March 24, 2020.  However, ATF located a series of instant messages between Perry and another person, referred to herein as "Individual 2," that occurred between around 8:40 p.m. and 9:00 p.m. on January 27, 2020, the night before the "robbery."  To put the messaging in context, it is helpful to know that the UC texted Cousin at around 7:30 p.m. that evening, saying, in part, "I'm on my layover in ATL.  Be there [in Boston] late tonite bro.  I'll hit your when I land."  At around 10:18 p.m. the UC placed a recorded call to Cousin and told him he had landed in Boston.

During the messaging between Perry and Individual 2, they referred to Cousin as "bump" or "bumpy."  Individual 2 began the messaging with the words, "Shit bump was supposed to come back and scoop me [pick me up] but he said he had to run to the bean [Boston]."  Shortly thereafter Perry sent the following message to Individual 2, who appears to

have known about the plans: "But Dude ain't land yet," clearly a reference to Perry's understanding that the UC had not yet arrived in Boston. A short while later Perry said, "Man I am only coming out when it's time to," and a bit further yet in the messaging said, "Sitting around them [apparently referring to the other conspirators] dirty ain't my cup of tea." "Dirty" is a common slang term for being in possession of a firearm.

Cousin's Conversations with the CW Regarding Firearms

Cousin had several conversations with the CW during the period leading up to the "robbery," some of which contained references to the possession of firearms by Cousin.

For example, on January 9, 2020, Cousin called the CW, who was not expecting the call and therefore was not prepared to record it. Most of the conversation was unrelated to the stash-house robbery, but during the conversation Cousin did tell the CW that he had "MACs" for the robbery. A MAC-11 is both a specific make and model of subcompact machinegun and a general street term for any such firearm.

On January 25, 2020, the CW recorded a phone call with Cousin. During the call, the defendant said, "We gotta sit down, we gotta round up everything, I just came up on another [inaudible], I got it right now." The CW asked Cousin, "Another breezy?" Cousin responded, "Yeah." "Breezy" is another street term for a firearm.

And on January 27, 2020, the day before the robbery was to occur, the CW had another recorded conversation with Cousin. During the conversation Cousin emphasized the importance of maintaining communication for something that is "life changing." Later in the conversation Cousin said, "Everything gotta be secure bro. You gotta have vehicle, you gotta have fucking artillery, you gotta have [pause], all of these different things in effect." Cousin said sometime after this that "It's going to have to be nothing less than three, four motherfuckers bro … to

16

overwhelm these motherfuckers."   The reference to "artillery" is an obvious reference to firearms.

### Further Examination of Perry's Phone

Further examination of the extraction from Perry's phone shows, among other things, that on October 18, 2019, he took a photograph of a Sig Sauer, Model P229, semi-automatic firearm, a copy of which was attached as Exhibit D to Perry's motion for release.  ATF is highly confident that it is a real firearm because, in addition to its general appearance, the serial number is visible.  (The agents have been unable thus far to conduct a trace on the firearm because the ATF employees who generally perform this task have been unavailable due to the coronavirus pandemic.)

The extraction also shows, among other things, that there was additional messaging contact between Perry and the defendant, beginning on January 24, 2020.  Among other things, at around 7:42 p.m. on January 27, 2020, Perry sent the following message to the defendant: "Dawg is in ATL in a lay so we looking good."  This is an obvious reference to the UC's layover in Atlanta and a clear indication that the defendant knew what was going on and was part of the conspiracy.  There were no explicit references to firearms.

### ARGUMENT

The evidence adduced at the original detention hearing established probable cause to believe the defendant had committed both the crime charged in his indictment and the conspiracies to commit a Hobbs Act robbery and to possess cocaine with intent to distribute and that he should be detained pending trial.  The evidence clearly showed that as of February 7, 2020, there were conspiracies between at least Cousin and Perry to commit a Hobbs Act robbery of a drug stash house and to distribute and possess with intent to distribute the 10 kilos

of cocaine that they expected to obtain through the robbery. The evidence showed that these conspiracies continued up to and including the time of their arrests. And the evidence set forth above shows that by the end the defendant clearly was part of the conspiracies.  While it may be true that there are no overt references to firearms in the text messages between the defendant and Perry, both Perry and Cousin had conversations with both the CW and the UC in which there were such explicit references.  Indeed, Cousin spoke of machineguns on more than one occasion.  Statements of coconspirators made in furtherance of a conspiracy are admissible against all members of the conspiracy, and these statements – including in particular Cousin's statement to the UC on January 28 that there was a driver in the near vicinity who had the guns – are admissible against the defendant.  And while it also is true that the agents' collective attention  unfortunately was diverted to the wrong vehicle that day and the defendant got away, there clearly was plenty of opportunity for Perry and Cousin to give weapons to the defendant to hold.  Indeed, the bag the defendant carried out of the residence in Quincy could easily have held the weapon depicted in the photograph on Perry's phone, as well as other firearms, and Cousin could have provided firearms to the defendant at a location near Logan that was not covered by cameras.

It is true that agents approached the defendant on January 31 and he consented to a search of his home and his car. This shows no more than that three days later he (wisely) no longer had the guns. It is also true that the defendant gave ATF permission to search a phone that was in his car, but the phone had no SIM card and clearly was not the phone that he was using on January 28, 2020.

Given his brazen involvement in this serious crime while wearing a court-ordered GPS monitor, as well as the extremely strong evidence against the defendant in the case as currently charged and the defendant's inability to stay clear of guns, the government continues to believe

18

that no conditions would adequately protect the community.

The Coronavirus

There is no denying that the coronavirus is a terrible scourge and that jail presents risks that many other environments do not. It is also true that Wyatt has experienced some positive test results. As of this writing the last statistics reported to the United States District Court for the District of Rhode Island were submitted on April 27, 2020 and reflected 8 positive tests, and there is another report due today. A copy of the April 27 report is attached hereto. However, it is the government's understanding that the positive tests were almost all from one pod, or unit, and that those who have tested positive have been quarantined.

As the April 27 report shows, Wyatt is taking extraordinary steps to try to protect staff and inmates from the virus and to take appropriate steps when positive tests do arise. More importantly for these purposes, however, it is the government's understanding that, while the first inmate ultimately to test positive was assigned to the defendant's pod, he was transferred in just under 24 hours to another unit as a result of a keep-separate order. The government also understands that one individual tested positive in the defendant's unit on the evening of April 28 but that this inmate had no contact with the defendant.

The defendant himself has no comorbidities rendering him more susceptible to contracting the virus and has no symptoms suggesting he has contracted it. The defendant's position is thus based primarily on generalized concerns regarding COVID-19 and not on factors particular to him. Weighed against that are the concerns for the safety of the community, which the defendant concedes are the same as they were when the Court decided that the defendant should be detained based on dangerousness. In this case, the danger posed by a man who participated in serious crimes while on release in another case – indeed, while wearing an ankle monitor – outweighs the generalized concerns he expresses about being incarcerated during the

pandemic.

The Current Status of the Conspiracy Case As Regards the Defendant

The defendant is correct that, were it not for the coronavirus pandemic, he would have been indicted by now in the conspiracy case, and he suggests that his inability to get discovery in that case is a factor to consider in deciding the Motion.  Motion at 3.  While the government disagrees that this is an appropriate factor to weigh, the government suggests a possible solution to the defendant's perceived predicament: the defendant could waive indictment and agree to be charged with the two conspiracies by information.  Undersigned counsel cautions that this is not an offer and that the concept would have to be approved by the appropriate supervisors in the United States Attorney's Office.  Undersigned counsel further recognizes that an information normally is filed in the context of a plea agreement.  But undersigned counsel is aware of nothing in law or logic that would preclude this solution if both sides agreed to it.

## **CONCLUSION**

For the foregoing reasons, the Motion should be denied.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:   /s/Robert E. Richardson
ROBERT E. RICHARDSON
Assistant U.S. Attorneys

## **CERTIFICATE OF SERVICE**

Suffolk, ss.:                                             Boston, Massachusetts
                                                         April 30, 2020

        I, Robert E. Richardson, hereby certify that this document filed through the ECF system
will be sent electronically to the registered participants as identified on the Notice of Electronic
Filing (NEF).

                                        /s/Robert E. Richardson
                                        ROBERT E. RICHARDSON